# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| **ACADEMY, LTD.**<br>　　　　　　**PLAINTIFF**<br>**V.**<br><br>**A&J MANUFACTURING, LLC and**<br>**A&J MANUFACTURING, INC.**<br>　　　　**DEFENDANTS** | **Case No._____** |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff Academy, Ltd. ("Academy") hereby files this Complaint for Declaratory Judgment against Defendants A&J Manufacturing, LLC and A&J Manufacturing, Inc. (collectively "A&J").

## JURISDICTION AND VENUE

1.     This is an action for declaratory judgment of non-infringement as well as invalidity and unenforceability under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.* and under the Patent Laws of the United States, 35 U.S.C. § 271 *et seq.* and 28 U.S.C. § 1338(a).

2.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 1400 because A&J sells its products in this judicial district.

3.     A&J is subject to personal jurisdiction in this judicial district at least due to its business in this judicial district including regularly doing or soliciting business, engaging in other persistent conduct, and/or deriving substantial revenue from goods sold to Texas residents.  More specifically, A&J grill products, including the Duo Grill alleged to embody what is claimed in the Patents-in-Suit, have been and are being sold in Lowe's stores in the Houston, Texas area as well as across the State of Texas.

1

4.     A&J has engaged in discussions with Academy concerning several redesigned grills, and as a part of these discussions, despite the clearly non-infringing design of these grills, A&J asserts that these grills infringe the Patents-in-Suit and fought the introduction of these grills in the ITC Investigation that is currently going on between the parties.  Further, John Lee Simms, II, owner of A&J, has had business discussions with Academy and has separately suggested that these redesigned grills infringe, despite the clear evidence to the contrary.  A&J also has asserted that the Patents-in-Suit are not invalid and are not unenforceable.

5.     As a result of the foregoing, an actual, immediate and justiciable controversy exists regarding whether the redesigned grills infringe the Patents-in-Suit and whether the Patents-in-Suit are invalid and/or unenforceable.

**THE PARTIES**

6.     Academy is organized and existing under the laws of the state of Texas having its principal place of business at 1800 N. Mason Rd., Katy, TX 77449.

7.     A&J Manufacturing, LLC is a Georgia corporation with its principal place of business located at 2465 Demere Road, St. Simons, GA 31522.

8.     A&J Manufacturing, Inc. is a Florida corporation and an affiliated company under common ownership and management with A&J Manufacturing, LLC.

**THE PATENTS-IN-SUIT**

9.     The patents at issue are U.S. Patent No. 8,381,712 ("the '712 patent"), U.S. Patent No. D662,773 ("the '773 patent"), and U.S. Patent No. D660,646 ("the '646 patent"), (collectively, "the Asserted Patents" or "the Patents-in-Suit").

A.   **The '712 Patent**

10.    The '712 patent is entitled "Simultaneous Multiple Cooking Mode Barbecue Grill."  It issued on February 26, 2013, based on U.S. Patent Application Serial No. 11/193,320 ("the '320 application"), which was filed on July 30, 2005, and in turn asserted priority to provisional applications filed on July 31, 2004.  It names John Lee ("Jay") Simms, II as the inventor.

11.    The '712 patent discloses barbecue grills having a gas cooking unit and a solid fuel cooking unit mounted on a single support structure.  Figure 1 of the '712 patent is reproduced below:



12.    Figures 2 and 3 are similar.  Figure 2 adds a shelf on the other end of grill from the side burner shown above in Figure 1, and Figure 3 has an offset firebox in lieu of the shelf, to convert the solid fuel-fired unit into a smoker.

13.    The '712 patent has three independent claims—claims 1, 10 and 17—having similar scope, except that claim 17 requires the two cooking units to have a substantially cylindrical shape.  The claims all require that the first cooking unit use gas cooking fuel and the second cooking unit use solid cooking fuel.  The claims further

3

require that the two cooking units each have at least one grill, be simultaneously operable, have their own independently openable covers, and have at least one exhaust attached to each cover.

14.     The dependent claims add requirements of a side burner (claims 2 and 11); a firebox for using the second unit as a smoker (claims 3 and 12); that the two cooking units are independently operable of each other (claims 4 and 13); at least one substantially vertical panel between the two cooking units (claims 5 and 14); two wheels on the support structure (claim 6); a fuel container holding structure (claims 7 and 15); that the two cooking units can hold food over a flame (claim 8); and at least two exhausts on the cover of the first cooking unit (claims 9, 16 and 20).  Two other claims that depend from claim 17 require the substantially cylindrically shaped cooking units to be aligned substantially coaxially (claim 19), and the openable covers of each cooking unit to form a portion of their substantially cylindrical shapes (claim 19).

15.     Over an eight-year period from filing in 2005 to issuance in 2013, the prosecution of the '712 patent included *seven* office actions; *two* requests for continued prosecution; *six* responses/amendments; *two* examiner interviews; *two* notices of appeal; and *one* appeal brief.  Several of the supposedly important features of the claims as finally allowed—grills, openable covers, and exhausts—were ***not even described*** in the '712 patent application as filed.  Mr. Simms had to add them by amendment during prosecution in his attempts to distinguish the prior art.

16.     When the application for the '712 patent (the '320 Application) was filed, no original claims recited any "exhaust," "exhaust means," or "openable first/second covers."  The '320 application as filed contained neither a definition nor a description of

any of those features -- and the terms *exhaust* and *exhaust means* did not appear anywhere in the originally filed application.  The only disclosure identified as providing written description support for "exhausts" -- unlabeled drawings of smoke stacks in Figsure 1-3 -- was offered years later during prosecution.  The Applicant later voluntarily cancelled or amended claims to "openings" in the grill lids in response to repeated rejections by the Examiner.  By acquiescing in the Examiner's rejections, the Applicant relinquished a claim scope of "exhaust" or "exhaust means" that would broadly encompass all "openings" on or around grill lids.

17.    Every claim of the '712 patent includes an *exhaust* or *exhaust means* within its scope.  Nothing in the '712 patent claims suggests that either term was intended to have a broader meaning than the other, even though recited in different claims. The '712 specification does not define or even refer to *exhaust* or *exhaust means* except by pointing to the smoke stacks in the drawings.  There is no disclosure of a broader concept of "exhaust" anywhere in the '712 patent.

18.    After two prior rejections and responses by the Applicant, the Examiner rejected pending claims 1-2 and 16-17 as anticipated by either U.S. Patent No. 3,802,413 to Pepin ("Pepin") or U.S. Patent No. 4,878,477 to McLane ("McLane").  Pepin was said to disclose a combined camping stove and barbecue having an upper barbecuing portion using charcoal 36 and a lower stove portion provided as a heating or stove element 27 that slides out from the case 20 to allow a second cooking surface.



19.     McLane was said to disclose a barbecue grill having multiple grill housings in a common support stand.  As shown in Figure 1 below, grill housing 14 is adapted to be used with a gas heating unit while grill housings 16 are adapted to be used with conventional charcoal heat sources. Grill housings 14 and 16 are housed by support frame 13, which is supported by stand 12.



McLane Figure 1

20.     In both grounds of rejection, the Examiner stated that each reference disclosed all features of the rejected claim(s).

21.     In response, the Applicant amended the claims, adding new independent claim 21 directed to a multiple mode barbecue grill having, *inter alia,* a second

retractable cover that included "at least one opening formed therein that permits the release of hot gases."  In the remarks accompanying the Amendment, the Applicant urged that claim 21 was neither anticipated nor rendered obvious by the prior art.  No other arguments were presented.

22.    On June 23, 2010, the Examiner rejected all claims, including new claim 21, as obvious, based on McLane in view of U.S. Patent No. 4,665,891 to Nemec ("Nemec").  Figure 1 of Nemec is shown below:



23.    The Examiner stated:

> Nemec also teaches the enclosure 12 includes ***at least one opening (smoke stack 48) formed therein to permit the release of hot gases.*** Having the vent on the cover instead of on any other part of the cooking chamber is deemed a matter of rearrangement of parts that does not affect the working of the vent or the cooking chamber. . . It would have been obvious to one of ordinary skill in the art at the time of the invention to modify McLane's cooking device by including retracting covers for the cooking units ***and also provide a vent in the cooking chamber in order to provide effective means of controlling the heating rate.***

24.    In response, the Applicant canceled all pending claims and added new claims 22-42.  New claims 30 and 31, depending from new independent claim 22,

recited:

> (New) The barbeque grill of claim 22, wherein the first cover comprises at least two *openings to permit the passage of gases.*

> (New) The barbeque grill of claim 22, wherein the second cover comprises at least one *opening to permit the passage of gases.*

25.     New dependent claims 38 and 39 were formulated differently (because they depended from a means-plus-function base claim), and recited:

> (New) The barbeque grill of claim 32, *wherein the first cover means comprises at least two means for permitting the passage of gases.*

> (New) The barbeque grill of claim 32, *wherein the second cover means comprises at least one means for permitting the passage of gases.*

26.     The Examiner rejected the independent claims under 35 U.S.C. § 103 based on McLane in view of Nemec, stating it would have been obvious to include openings to permit the passage of gas in order to vent the chamber and control cooking in it.  The placement of the vent on the hood was considered to be a mere rearrangement of parts and an obvious design choice.

27.     The Examiner further rejected the claims based on U.S. Patent No. 6,209,533 to Ganard ("Ganard"), said to disclose a second cooking unit that "comprises at least one opening ... to permit the passage of gases."  As in the previous office action, the Examiner acknowledged that Ganard did not disclose the vent being located in the cover, but he considered this to be an obvious matter of rearrangement of parts that would not affect functioning of the unit.  Figure 1 of Ganard is presented below, showing a grill with smokestack 28 positioned on end wall 26 of smoker chamber 12 and lid 20 connected by hinges 22.



Ganard Figure 1

28.     In response to this rejection, the Applicant canceled claims 30-31 and 38-39 and amended independent claim 22 to require that the grill have *"an openable first cover attached to the first cooking unit . . . wherein the first cover includes at least one exhaust"* and *"an openable second cover attached to the second cooking unit . . . wherein the second cover includes at least one exhaust."* This language continued into the issued claims. The Applicant added the limitations requiring the openable covers to include exhausts after the Examiner stated that "Nemec does not teach the cover (cover means) comprising the opening (means for permitting the passage of gases)."

29.     Regarding means-plus-function claim 32, the Applicant responded to the rejection by specifically identifying the structures that corresponded to the means-plus-function limitations. For the "at least one exhaust means" of the first cover, the Applicant pointed to the two smoke stacks on the first cooking mode unit in Figures 1 and 2. Applicant identified the smoke stack on second cooking unit 120, 220 as the "at least one exhaust means" of the second cover. The Applicant amended claim 32 to require openable cover means attached to each of the two cooking means with each cover means including at least one exhaust means. In the amended claims, the configuration of

the exhaust/exhaust means was to be based on the type of fuel used in each cooking unit.

30.     Concerning the prior art rejections, the Applicant argued that the claim language added to independent claims 22, 32, and 40 regarding the exhausts included in the first and second covers formed the basis of patentability for these claims.   The Applicant distinguished the prior art Nemec and Ganard references by stating:

> Neither Nemec nor Ganard teaches or suggests that the configuration of one smoke stacks [sic] on the cover of one cooking unit would be based on the type of fuel used in that cooking unit, and that the configuration of another smokestack on the cover of another cooking unit would be based on the type of fuel used in that other cooking unit. Thus, ***Applicant submits that Nemec and Ganard failed to teach or suggest . . . "an openable first cover. .. includ[ing] at least one exhaust" . . . and "an openable second cover attached to the second cooking unit... includ[ing] at least one exhaust "***

31.     By arguing that neither reference taught or suggested a *smoke stack* on the covers of the first or second cooking units, and further equating *smoke stacks* with the claimed *exhausts,* the Applicant distinguished the claimed exhausts as smoke stacks, as opposed to vents or other types of openings, in order to overcome the prior art rejections.

32.     The Examiner rejected all of the narrowed claims under 35 U.S.C. § 112 because there was no written description support for an exhaust "having a configuration based on the type of fuel used in the cooking unit," which the examiner considered to be new matter.   The Examiner objected to the drawings as not showing every feature of the claimed subject matter, because the exhausts and the cover (cover means) were not shown.   And he again rejected all claims as obvious based on McLane in view of U.S. Patent No. 4,700,618 to Cox ("Cox"), noting that:

> The limitation that at least one exhaust is on the first or second cover instead of on the cooking units is deemed a matter of rearrangement of parts that would not affect the

functioning of the units.  *In re Japikse,* 181 F.2d 1019, 86 USPQ 70 (CCPA 1950), MPEP 2144.04 VI C.  In this case the exhaust on another part of the unit other than the cover would not make the exhaust nonfunctional.

33.    McLane and Cox teach barbecue grills with multiple cooking units that are simultaneously operable.  Figure 1 from Cox, issued on October 20, 1987, shows a barbecue grill comprising, among other features, a smoker oven (12) with a "door" (38) and two chimney exhausts (20 and 24).  The two chimneys 20 and 24 are "connected with respective cooking volumes within smoker 12."



34.    The Examiner acknowledged that Cox failed to show the exhausts located on the openable covers of the cooking units, but considered the modification to have the exhausts actually on the cover to be obvious, as a matter of rearrangement of parts that would not affect the functioning of the units.  The Examiner also noted that having the exhaust on the cover was well known in the art, citing to U.S. Patent No. 6,606,986 to Holland ("Holland '986").

35.    The Applicant amended the drawings by adding numerals calling out the

smoke stacks on each of the grills in Figures 1-3, and adding language to the specification defining each of the smokestacks as exhausts.  The Applicant cited Figures 1-3 as the sole written description support for "exhausts" on the openable covers.  The Applicant amended the specification to specifically name smokestacks 111, 122, 211, 222, 311 and 322 as exhausts.  At no point did the Applicant amend the specification to disclose a broader inventive concept of exhausts than that depicted by the numbered smokestacks in each of Figs. 1-3.  Further, the Applicant deleted claim language requiring exhausts to be configured based on the type of fuel used in the cooking unit.

36.    In an Interview Agenda dated December 13, 2011, the Applicant stated "the as-filed drawings illustrate that the exhausts for the respective gas and solid fuel cookers differ in at least the number of exhaust elements."  The Applicant thus specifically characterized the smoke stacks of the drawings as *exhausts* of the gas and solid fuel cookers rather than *examples* of exhausts, or as representative of a more broadly disclosed concept.  Similarly, the Applicant's Appeal Brief repeatedly characterized the claimed *exhausts* and *exhaust means* by reference to the exact same structures in the specification: Figures 1-3, Nos. 112, 212, 312, 122, 222 and 322.  The Applicant equated the scope of *exhaust* and *exhaust means* by identifying the same disclosure and structures as support for each.

**B.    The '646 Patent**

37.    The '646 patent is entitled "Pair Of Lids For A Dual Grill" and names John Lee Simms, II as the inventor.  It issued on May 29, 2012, based on Application Serial No. 29/392,019 ("the '019 application"), which was filed on May 16, 2011— nearly six years after the '712 patent application.  The belatedly filed '646 patent

application initially asserted priority as a continuation of the application for the '712 patent.  However, the statement on the face page of the '646 patent stating that it issued as a continuation is a printing error because, as the prosecution history makes clear, it is not.

38.    Figure 1 of the '646 patent below is the same as Figure 1 of the '712 patent, except for substitution of dashed lines for solid lines for all but the covers or "lids" and in each lid for an inset thermometer.



*FIG. 1*

39.    The remaining figures—Figures 2-7 below—are ***not*** found in the '712 patent.



*FIG. 2*

*FIG. 3*

*FIG. 4*          *FIG. 5*



*FIG. 6*

*FIG. 7*

40.    The '646 patent has a single claim:  "*The ornamental design for a pair of lids for a dual grill, as shown and described.*"  Consistent with this claim, the only items that are drawn in solid lines in the figures and that form part of the claimed invention are the pair of semi-cylindrical lids, each with a hole for an inset thermometer.  The lids contain surface shading showing that the lids are solid surfaces.  The rest of the barbecue grill is shown in dashed lines and does not form part of the claimed invention.

41.    In a first office action mailed September 22, 2011, the Examiner rejected the claim under 35 U.S.C. § 112, first paragraph, because the '646 patent application was not entitled to assert priority as a continuation of the '712 patent application.  The Examiner concluded that there was no support in the '712 patent application for Figures 3-7 of the '646 patent application.

42.    In his response dated December 20, 2011, Mr. Simms amended the application to claim priority as a continuation-in-part of the '712 patent application and obtain allowance of the application.  In the Notice of Allowance mailed January 26, 2012,

the Examiner acknowledged Mr. Simms' amendment and again noted that the '646 patent application was not entitled to the benefit of the filing date of the '712 patent application, but declined to further consider that issue "unless the filing date of the earlier application is actually needed, such as to avoid intervening prior art."

43.    In a response dated February 17, 2012, Mr. Simms disputed the Examiner's statement that the '646 patent application was not entitled to the filing date of the '712 patent application.  Mr. Simms also responded to the Examiner's concern about the possible existence of intervening prior art with the following improper statement:

> In examination of the present application, the examiner must have considered all of the art dated up until the filing date of the present application, including those references cited by the applicant in information disclosure statements filed on June 22, 2011, December 20, 2011, and January 4, 2012.  ***The examiner did not need to, and is instructed not to, consider the entitlement to priority of the present application because the examiner did not identify any references which (1) question the patentability of the present application, and (2) are dated between the filing of the parent application and the filing date of the present application.  Thus, any statement of entitlement to priority by the examiner is dicta*** …

44.    The information disclosure statements referenced by Mr. Simms did not include any disclosure of the public uses and sales activities for A&J's Char-Griller Duo Model #5050 Grill ("Duo Grill") that occurred before the "critical date," *i.e.*, more than one year before the May 16, 2011 filing date of the '646 patent application.  Instead, all that Mr. Simms disclosed was a third-party article about the Duo Grill published in July/August 2010, dated ***less than one year*** before the filing date of the '646 patent application.

C.    **The '773 Patent**

45.    The '773 patent is entitled "Set Of Smoke Stacks For A Dual Grill."  It

16

issued on July 3, 2012, based on Application Serial No. 29/392,027 ("the '027 application"), which was filed on May 16, 2011.  The application likewise initially asserted priority as a continuation of the application for the '712 patent, but the '773 patent is correctly shown to claim priority as a continuation-in-part due to an amendment during prosecution.

46.    Figure 1 of the '773 patent below is the same as Figure 1 of the '712 patent, except for substitution of dashed lines for solid lines for all but the exhausts or "smoke stacks."



*FIG. 1*

47.    The remaining figures—Figures 2-7 below—are not found in the '712 patent.



*FIG. 2*          *FIG. 3*



FIG. 4

FIG. 5

FIG. 6

FIG. 7

48.   The '773 patent has a single claim:  "*The ornamental design set of smoke stacks for a dual grill as shown and described.*"  As with the '646 patent, the only items that are drawn in solid lines and form part of the claimed invention are the two smoke

stacks on the gas grill and the single smoke stack one on the solid fuel grill.  The rest of the barbecue grill is shown in dashed lines and does not form part of the claimed invention.

49.     The prosecution history of the '773 patent paralleled that of the '646 patent, except that Mr. Simms did not file any response to the Notice of Allowance similar to the one dated February 17, 2012 in the prosecution of the '646 patent application.

50.     In a first office action mailed October 3, 2011, the Examiner rejected the claim under 35 U.S.C. § 112, first paragraph, because the '773 patent application was not entitled to assert priority as a continuation of the '712 patent application.  In his response dated January 3, 2012, Mr. Simms amended the application to claim priority as a continuation-in-part of the '712 patent application.   And, in a Notice of Allowance mailed March 5, 2012, the Examiner acknowledged this amendment and noted that the '773 patent application was not entitled to the benefit of the filing date of the '712 patent application, but declined to further consider that issue "unless the filing date of the earlier application is actually needed, such as to avoid intervening prior art."

51.     As with the '646 patent application, Mr. Simms failed to disclose the public uses and sales activities for the Duo Grill more than one year before the May 16, 2011 filing date of the '773 patent application.  Again, he only disclosed the same third-party article about that product published in July/August 2010, less than one year before the May 16, 2010 "critical date" for the '773 patent.

**THE PRODUCTS AT ISSUE**

52.     Academy has developed several new grills.  These grills are the Outdoor

Gourmet Pro Triton Supreme Style # FSODBG1205 (*see* Exhibit A, Photos of FSODBG1205 Grill), Outdoor Gourmet Pro Triton DLX Style # FSODBG3003 (*see* Exhibit B, Photos of FSODBG3003 Grill), Outdoor Gourmet Triton Original Style # FSOGBG3002 (*see* Exhibit C, Photos of FSOGBG3002 Grill); and Outdoor Gourmet Triton Gas/Charcoal Combo Style #FSOGBG1203 (also known as model number CG3023A) (*see* Exhibit D, Renderings of FSOGBG1203 Grill).   These grills may collectively be referred to as the "Redesign Grills."

53.     A feature common to each of the Redesign Grills is that the lid for the gas grill side has lateral vents on the fixed portion of the grill.  There are lateral vents – and not a smoke stack – on the gas side of each of these grills, and the lids on the gas side do not include any smoke stack, pipe, shutter, or other structure that would allow for gases to be expelled.  Instead, the gases flow through the lateral openings or vents in the fixed base of each grill.  Further, user manuals (Exhibits E-G) confirm that each of the Redesign Grills lacks a smoke stack, chimney or other similar structure on the openable gas side grill lid.

54.     The Redesign Grills include only a single cooking unit with two lids and a divider to separate the side of the grill that uses gas fuel from the side of the grill that uses charcoal fuel.  The divider is integral with, or part of, the single cooking unit.  User manuals for the Redesign Grills (Exhibits E-G) confirm that each of these grills includes a single body including a divider to separate the side of the body that uses gas fuel and the side that uses charcoal fuel.

55.     Moreover, the Redesign Grills have been or in the process of being imported into the United States unassembled and the customer (or someone else) will

assemble once sold.  The lids of each grill are not attached to the body before the customer assembles.  The Redesign Grills also are not imported or sold into the United States with a side firebox attached to the grill.  A user must assemble each grill after purchase to attach a firebox to the grill.

## COUNT I
## DECLARATORY JUDGMENT OF NON-INFRINGEMENT

56.     Academy realleges and incorporates paragraphs 1-55 as if fully set forth herein.

57.     Academy has developed, has had manufactured, and is selling the Redesign Grills.  A&J has alleged that Academy infringes the Patents-in-Suit and that A&J intends to assert the Patents-in-Suit against the Redesign Grills.  Therefore, an actual controversy has arisen and exists as to whether Academy has infringed the Patents-in-Suit.

58.     The Redesign Grills do not infringe the '712 patent as they only have one smokestack on the charcoal side and the gas side does not include smokestacks but rather has lateral vents on the fixed portion of the grill.  The gas grill portion of these grills lacks a smoke stack, chimney or other similar structure on the gas grill side lid and there is no exhaust on an openable cover on the gas side.

59.     The Redesign Grills do not infringe the '712 patent because they lack a first and second "cooking unit" or "means for cooking."  The claims require that a first cooking unit (means for cooking) and a second cooking unit (means for cooking) be attached to a support structure.  None of these grills contain independent, separate, first and second cooking units.

60.     Moreover, the Redesign Grills have been or are being imported into the

United States unassembled and cannot infringe the '712 patent.  The claims of the '712 patent require that the covers be attached to cooking units, and the Redesign Grills do not contain covers attached to cooking units.  Dependent claims 3 and 12 depend from claims 1 and 10, respectively, and further require a "firebox" / "firebox means."  The Redesign Grills are not imported or sold into the United States with a side firebox.  Accordingly, a user must assemble each grill after purchase to attach a firebox to the grill.  Thus, none of these grills infringe dependent claims 3 and 12.

61.    The Redesign Grills do not infringe the '646 patent or the '773 patent because the lids have a different shape and these grills do not include smokestacks on the gas side of the grill.

62.    The Redesign Grills have a substantially different overall appearance from the patented design.  This is seen through comparing the figures of the '646 patent to the accused products.  An ordinary observer having knowledge of the prior art would not purchase the Redesign Grills thinking they were the patented design.  The differences between the Redesign Grills and the designs claimed in the '646 and '773 patents relate to the prominent parts of each design, not "minutiae" or "insignificant details."  The differences are significant and readily visible to an ordinary observer.

63.    There are differences in what is claimed in the figures of this patent and the designs of the Redesign Grills.  The side surfaces of the grill lids in the '646 patent design are more rounded or circular, while the photos and renderings of the Redesign Grills show surfaces that are more boxy and include more straight edges than the lids in the '646 patent design.  Further, the hinges on the lids of the Redesign Grills protrude outward from the lid surface, whereas the '646 patent design requires that there be no

protrusions or outwardly facing extensions from the rear portion of the openable cover. The lids of these grills do not have a continuous semicircular or rounded appearance. Rather, there are portions of the lid design having straight/flat edges.  Further, the hinges on the lids of the Redesign Grills protrude outward from the lid surface, whereas the '646 patent design requires that there be no protrusions or outwardly facing extensions from the rear portion of the openable cover.

64.     Based on at least these differences from the '646 patent design and the Redesign Grills, the overall impression is that these grills are distinctively different and an ordinary observer seeing these products would notice the differences from the '646 patent design and would not be so confused as to purchase one supposing the Redesign Grills to be the '646 patent design.  Accordingly, the Redesign Grills do not infringe the '646 patent.

65.     With respect to the '773 patent, the Redesign Grills lack any smoke stacks on the gas side of the grill.  The sole claim and each of the figures of this patent require smoke stacks on the gas grill side.  In the absence of any smoke stacks on the gas side, the Redesign Grills cannot infringe.  Based on at least these differences from the '773 patent design and the Redesign Grills, the overall impression is that these grills are distinctively different and an ordinary observer seeing these products would notice the differences from the '773 patent design and would not be so confused as to purchase one supposing the Redesign Grills to be the '773 patent design.  Accordingly, the Redesign Grills do not infringe the '773 patent.

66.     Pursuant to the Federal Declaratory Judgment Act, Academy requests a declaration by the Court that it does not infringe the Patents-in-Suit.

## COUNT II
## DECLARATORY JUDGMENT OF INVALIDITY

67.     Academy realleges and incorporates by reference paragraphs 1-66 as if fully set forth herein.

68.     Based on the allegations above, an actual controversy has arisen and now exists as to the validity of the Patents-in-Suit.

69.     The Patents-in-Suit are invalid for failure to meet one or more of the requirements set forth in Title 35 of the United States Code, including Sections 101, 102, 103, 112, and/or 171.

70.     The Patents-in-Suit are invalid because, among other things, there is prior art that renders them anticipated and/or obvious and examples are set forth below.

### 1.     Invalidity of the '646 and '773 Patents Under 35 U.S.C. § 102(b) Based on A&J Duo Grill

71.     The '646 patent and the '773 patent are invalid because they are anticipated under 35 U.S.C. § 102(b) by A&J's own grill product, the Duo Model #5050 grill ("the Duo Grill").  A&J began selling a version of the Duo Grill in the United States in 2007.  The Duo Grill embodies the '646 and '773 patents, but A&J did not file for the patents until May 2011.  Accordingly, these patents are invalid under 35 U.S.C. § 102(b) because the grill designs depicted in these patents were on sale in the United States more than one year prior to the application date for the patents.

72.     A&J has alleged that the Duo Grill incorporates the "designs" found in the '646 patent and the '773 patent.  One of A&J's prior customers that purchased the Duo Grills for sale more than one year before the filing of these patents in the United States was Academy.  Academy purchased a small quantity of the Duo Grill to be sold in Academy retail stores from A&J in October 2006.  Academy began selling the Duo Grill

in select Academy retail stores in the United States in or about February 2007, and then began selling at Academy retail stores across the United States in 2008.   Academy purchased and sold over 10,000 Duo Grills from May 2008 to December 2009.

73.   During the period from 2007 to 2010, the design and appearance of the semi-cylindrical lids and the smoke stacks of the Duo Grill did not change.   More specifically, the smoke stacks depicted in the '773 patent are visually identical to or at least substantially the same as the smoke stacks in the A&J Duo Grills available from 2007-2010.   Further, the semi-cylindrical lids depicted in the '646 patent are visually identical to or at least substantially the same as the semi-cylindrical lids in the A&J Duo Grills available from 2007-2010.

74.   Academy also advertised the Duo Grill in print newspapers through the United States on multiple occasions in 2008 (Exhibits H-K).   These advertisements show a frontal view of the Duo Grill that corresponds to Figure 1 in both the '646 patent and the '773 patent.   In these advertisements, the semi-cylindrical pair of lids depicted in the '646 patent is visually identical to or at least substantially the same as the semi-cylindrical lids that Academy advertised for sale in a printed newspaper in April 2008. Also, the smoke stacks depicted in the '773 patent appear visually identical to or at least substantially the same as the smoke stacks that Academy advertised for sale in a printed newspaper in April 2008.

75.   A Duo Grill user manual is available on the Chargriller.com website (Exhibit L).   This manual is publicly accessible and has a 2006 copyright date.   The frontal view on this manual corresponds to Figure 1 in both the '646 patent and the '773 patent.   As can be seen by comparing them, the semi-cylindrical lids depicted in the '646

patent are visually identical to or at least substantially the same as the semi-cylindrical lids that were depicted in the user manual having a 2006 copyright date.  Also, the smoke stacks depicted in the '773 patent appear visually identical to or at least substantially the same as the smoke stacks depicted in the Duo Grill user manual.

76.  The '646 patent is anticipated by the A&J Duo Grill because, in a side-by-side comparison of the '646 patent drawings and photos of the Duo Grill, the design of the semi-cylindrical lids in the '646 patent appears identical to or at least substantially the same as the lids of the Duo Grill made prior to the effective filing date of the '646 patent. As this shows, the appearance of the Duo Grill lids is the same or nearly the same as the lids in the '646 patent drawings, satisfying the ordinary observer test.  Comparing photos of other views of the Duo Grill with the lids disclosed in the '646 patent also shows that the lids appear the same to an ordinary observer.

77.  Any differences between the design claimed in the '646 patent and the Duo Grill are so minor as to escape the attention of the ordinary observer, particularly given that the ordinary observer only gives "such attention as a purchaser usually gives." A&J has asserted that the Duo Grill embodies the claim of the '646 patent.  Because the Duo Grill satisfies the ordinary observer test, the '646 patent is invalid under 35 U.S.C. § 102(b) because it is anticipated by that grill.

78.  Like the '646 patent, a side-by-side comparison of the '773 patent figures and photographs and drawings of the Duo Grill made more than one year prior to the effective filing date of the patent shows that the smoke stacks in the Duo Grill appear substantially the same as those depicted in the '773 patent.  It shows that the smoke stacks of the Duo Grill appear identical or nearly identical to the smoke stacks in the '773

patent, satisfying the ordinary observer test.  The appearance of the smoke stacks in the Duo Grill is identical or at least substantially the same as the smoke stacks shown in the '773 patent.  An ordinary observer would find the two designs to be identical.

79.     Any differences between the design claimed in the '773 patent and the Duo Grill are so minor as to escape the attention of the ordinary observer."  Accordingly, the '773 patent is invalid under 35 U.S.C. § 102(b) because it is anticipated by the Duo Grill.

**2.     Additional Grounds for Anticipation of the '646 Patent**

80.     U.S. Patent No. 6,189,528 to Oliver (hereinafter "Oliver") was filed on May 25, 1999 and issued on February 20, 2001, well more than one year prior to the May 16, 2011 filing date of the '646 patent.  Oliver shows and describes a pair of lids for a dual grill.  Figure 19 of Oliver is virtually identical to the design shown in the '646 patent, including a pair of half-cylinder lids that are spaced apart.

81.     With respect to Figure 1 of the '646 patent, Oliver shows and describes a dual grill including a pair of lids that extend from the middle front of the grill to the back of the grill.  The lids further extend to the sides of the grill.  The two lids thus form two independent half cylinders as depicted in at least Figure 19 of Oliver.

82.     With respect to Figure 2 of the '646 patent, at least Figure 19 of Oliver depicts two independent half cylindrical lids with a visually defined gap/space separating the pair of lids (column 6, lines 7-16).

83.     Turning to Figure 3 of the '646 patent, although a back view of the grill of Oliver is not specifically depicted, it is evident from Figures 19 and 23 that Oliver includes dual independent half cylindrical lids again with a visually defined gap/space separating the pair of lids.  At least Figures 19 and 23 additionally show that the lids

extend to the back of the grill.

84.     With respect to Figures 4 and 5 of the '646 patent, a combination of Figure 19, Figure 23, and the side end view depicted in Figure 11 of Oliver depict a pair of half cylindrical lids.  Each of the lids depicted in Figures 19 and 23 include the same design.  These figures show that the lids extend from the front of the grill to the back of the grill and to each side/end such that a half-circular lid would be visible from each side (end) view.

85.     Oliver also anticipates Figure 6 of the '646 patent.  Although a top view is not specifically depicted in Oliver, at least Figure 23 shows that the lids of Oliver include dual independent half cylindrical lids and show the visually defined space separating the pair of lids.  The gap/space extends from the front to the back of the grill.  Figure 23 additionally shows that the claimed lids extend from the front of the grill to the back of the grill.

86.     The bottom view (Figure 7) of the '646 patent is entirely in phantom and therefore does not depict any claimed features of the dual lid design.

87.     As each figure of the '646 patent is disclosed in Oliver, the '646 patent is anticipated by Oliver.

88.     U.S. Patent Publication No. 2010/0083947 to Guillory ("Guillory") also anticipates the '646 patent.  More specifically, Figure 1 of Guillory shows a grill with dual lids in the shape of a half-cylinder.  There is a space between the two lids that is labeled 12C.

89.     U.S. Patent No. 4,090,490 to Riley (hereinafter "Riley") also anticipates the '646 patent.  Figure 1 of Riley shows a cylindrical lid on each barbeque.  Riley shows

a single grill in the shape of a barrel with a half-cylindrical shaped lid.

90.     In addition, there are various historical cylindrical cylinders that also anticipate the '646 patent.  "Rail-Road Barbecues" were used to promote the expansion of railroads in the United States prior to the civil war.  Further, barrel shaped boilers and smoke stacks on locomotives look similar to barbecues and smokers that later evolved in the early 1900s at churches and roadside stands and continue to be construed today. Accordingly, the prior art renders the '646 patent is invalid.

**3.     Obviousness of the '646 Patent**

91.     U.S. Patent No. 5,632,265 to Koziol (hereinafter "Koziol") teaches a pair of grill units side by side and spaced apart from each other (as shown in Figure 3).  It would have been obvious to modify the grill units of Koziol to be substantially cylindrical in shape such that the lids are in the shape of half cylinders.  Barbecue grills in the shape of cylinders in which the lids form a half cylinder have been around for a long time and it is not a novel design.

92.     The combination of Koziol and Riley also renders the '646 patent obvious.

93.     Koziol was filed on June 1, 1995 and issued on May 27, 1997, well more than one year prior to the May 16, 2011 filing date of the '646 patent.  Koziol teaches a pair of identical lids for a dual grid (*see, e.g.*, Figure 3).  Riley was filed on February 8, 1977 and issued on May 23, 1978, well more than one year prior to the May 16, 2011 filing date of the '646 patent.

94.     Turning to Figure 1 of the '646 patent, Koziol teaches a dual grill including a pair of lids that extend from the middle front of the grill.  Although a back view of the grill of Koziol is not specifically shown, it is evident from Figures 3 and 11

that the lids extend to the back and sides of the grill.  Although Koziol's lids are not cylindrical in shape, grills with cylindrical lids are well known in the art.  *See, e.g.,* Riley. The use of such a shape was common and well known to those of ordinary skill and has the advantages of simplicity and low cost.  Riley teaches a grill with a half cylindrical lid. As shown in Figures 1 and 4, the lid of Riley extends from the middle front of the grill to the back.  The lid further extends to the side of the grill.

95.     With respect to Figure 2, at least Figures 3 and 11 of Koziol show and describe two independent lids with a visually defined gap/space separating the pair of lids. Although Koziol's lids are not cylindrical in shape, grills with cylindrical lids were well known in the art (*i.e.*, Riley which shows in Figure 1 a grill with a half cylindrical lid).

96.     The combination of Koziol and Riley also discloses Figure 3 of the '646 patent.  Although a back view of the Koziol grill is not specifically shown, it is evident from Figures 3 and 11 that the Koziol device includes dual independent lids with a visually defined gap/space separating the pair of lids.  It would be understood by persons skilled in the art that the lids extend to the back of the grill.  Although Koziol's lids are not cylindrical in shape, grills with cylindrical lids were well known in the art (*i.e.*, Riley which shows and describes a grill with a half cylindrical lid in Figures 1 and 4 that extends to the back of the grill).

97.     Koziol and Riley also disclose the side views of Figures 4 and 5.  As shown in Figures 3 and 11 of Koziol, each set of lids includes the same design.  These figures show that the lids extend from the front of the grill.  Although a side view is not specifically depicted in Koziol, it would be understood by persons skilled in the art that the lids extend to the back of the grill and to each side/end.  Although Koziol's lids are

not cylindrical in shape, grills with cylindrical lids were well known in the art (*i.e.*, Riley which shows a grill with a half cylindrical lid in Figure 4, and the lid extends from the middle front of the grill to the back and further extends to the side of the grill and shows that a half-circular lid is visible from each side).

98.     With respect to Figure 6 of the '646 patent, although a top view is not specifically depicted in Koziol, it is evident from at least Figures 3 and 11 that the Koziol grill includes dual independent lids and there is a visually defined space separating the pair of lids.  The gap/space extends from the front to the back of the grill.  Although Koziol's lids are not cylindrical in shape, grills with cylindrical lids were well known in the art (*i.e.*, Figure 2 of Riley shows the top of the grill includes a half cylinder lid which extends from the front of the grill to the back of the grill).

99.     The bottom view (Figure 7 of the '646 patent) is entirely in phantom and therefore does not depict any claimed features of the dual lid design.

### 4.     Obviousness of the '773 Patent

100.     U.S. Patent No. 4,773,319 to Holland (hereinafter "Holland '319") was filed on January 25, 1988 and issued on September 27, 1988, well more than one year prior to the May 16, 2011 filing date.  Holland '319 shows a gas grill unit with two smoke stacks on the lid in Figure 2.

101.     U.S. Patent No. 4,664,026 to Milloy (hereinafter "Milloy") was filed on November 1, 1985 and issued on May 12, 1987, well more than one year prior to the May 16, 2011 filing date.  Figure 1 of Milloy discloses cylindrical smoke stacks on a grill in a location similar to that disclosed in the '773 patent.  The smoke stack is in the rear of the cylindrical axis of the lid and offset towards the side or end of the cylindrical lid.

31

Cylindrical smoke stacks have been used extensively over the last 100 years.

102.    The combination of Holland '319 and Milloy renders obvious the '773 patent insofar as Holland '319 shows and describes a pair of smoke stacks on an openable cover of a gas grill and Milloy shows and describes a single smoke stack on a barbecue cooking and smoking apparatus.   With respect to Figure 1 of the '773 patent, Holland '319 discloses a barbecue grill and cooker 10 including a housing 12.   Housing 12 comprises a bottom surface 18 with a gas burner unit 20 positioned in the center thereof although other types of heat sources are contemplated such as charcoal briquettes or an electric resistant heat source (*see* column 3, lines 14-27).   A hood 42 is pivotally attached to housing 12 and includes a handle 44 and two chimneys 46.   Chimneys 46 each have a cap 48 thereon with side ports 50 so that barbecue grill and cooker 10 can be operated during inclement weather (*see* column 3, lines 52-57).     Accordingly, Holland '319 discloses a (gas) grill including a set of smoke stacks, each including a rain guard (cap).   Milloy discloses a barbecue unit 10 including a firebox 12 and an oven 14. The oven is equipped with a flue or smoke stack 60 which is connected into the interior chamber of the oven through the wall of the oven in order to provide exhaust of heat and smoke that comes into the oven from the firebox.   The flue 60 has an end 62 to which may be connected a damper (not shown) which may be used to regulate the amount of flow through the flue 60 in order to control the temperature or the amount of heat and smoke passing therethrough.   *See* column 3, lines 50-58.

103.    The '773 patent also is obvious over Holland '319 in view of U.S. Patent No. 5,404,801 to Holland (hereinafter "Holland '801") which shows a single cylindrical smoke stack on the lid of a solid fuel grill.

104.    Milloy also teaches the use of a smoke stack exhaust affixed to the grill in a location similar to that disclosed in the '773 patent – rear of the cylindrical axis offset towards the side/end of the cylinder, such as in Figure 1.  The historical smoke stacks on cylinders and grills used for obviousness of the '646 patent also apply to the '773 patent.

### 5.    Invalidity Under 35 U.S.C. § 171

105.    The '646 patent and the '773 patent are invalid under 35 U.S.C. § 171 because the claimed designs are not ornamental.

### 6.    Invalidity of the '712 Patent

106.    Claim 1 is obvious over Holland '319.  Claim 1 is obvious over U.S. Patent No. 5,632,265 to Koziol based on the knowledge of one of ordinary skill in the art that all grills need "exhausts" for venting combustion air from gas and charcoal grills. Alternatively, claim 1 is obvious over Koziol in view of Holland '319 and obvious over McLane in view of Oliver and/or Holland '319.

107.    McLane and Pepin are also relevant in terms of the general concept of combining simultaneously useable charcoal and gas grills in one configuration.  Covers and placement of exhaust stacks or exhaust openings are obvious additions as some type of exhaust is always required for combustion and covering cooking containers to maintain heat has been done for many hundreds of years, if not thousands of years.

### a.    Invalidity Based on Oliver

108.    The preamble of claim 1 recites "a barbecue grill having multiple cooking units."  Oliver discloses a barbecue grill having multiple cooking units.  Looking at the Abstract, Oliver is directed to an "outdoor cooking system" or "portable grill easily carried as components."  Figures 19-21 and 23 show and describe barbecue grills having

multiple cooking units.  For example, in describing Figure 19, Oliver states that "FIG. 19 is a perspective view of an alternate embodiment of the cooking system of FIG. 1 in which two cooking systems are configured to operate together."  In describing Figure 20, Oliver states that "FIG. 20 is a perspective view of the cooking system of FIG. 19 wherein top reflectors are open and a container of fuel is positioned along one end thereof for cooking on a griddle on one side of the cooking system, and a charcoal grill is used on the other side."  These disclosures are readily understood when looking at Figure 20 of Oliver.

109.    Figures 19, 20, 23 of Oliver disclose "leg stands 24 and 26," which support the cooking units.  In fact, all of the embodiments of Oliver disclose leg stands 24 and 26.  In describing the embodiment of Figure 20, Oliver explains that "[t]his double width cooker is provided with support rods 120, 122 and 128 which are longer than rods 20, 22, 28 and 30, and are assembled and used in a similar manner to rods 20, 22 and 128.  Two each rods 30 are assembled with two reflectors 14 and four lid ends 18."

110.    The Figure 20 embodiment of Oliver discloses a first cooking unit configured to cook food using gas cooking fuel, which is the cooking unit on the left side of the grill.  For example, Oliver explains that "FIG. 20 is a perspective view of the cooking system of FIG. 19 wherein top reflectors are open and a container of fuel is positioned along one end thereof for cooking on a griddle on one side of the cooking system, and a charcoal grill is used on the other side."

111.    The first cooking unit is attached to the support structure (leg stands 24 and 26) in Oliver.

112.    While the gas unit on the left in Figure 20 (left) is shown with a griddle

instead of a "grill" or grate, a person skilled in the art would understand that griddles and grates are readily interchangeable depending on the type of food being cooked.  A person skilled in the art would understand that one could readily substitute a "grill" or grate for the griddle in the embodiment of Figure 20.  A grill or grate is disclosed in several of the embodiments of Oliver, including in Figures 20 and 21.

113.    In describing the embodiment of Figure 20, Oliver discloses that "two each reflectors 12 and 14 are assembled on rods 120, 122, 128 and 130."  The reflectors 12 and 14 correspond to openable covers, wherein reflector 12 corresponds to the openable first cover attached to the first cooking unit that selectively covers the first grill. Additionally, Oliver teaches that the lids can be designed to be independently openable in order to selectively cover the first grill:  "In this configuration [FIG. 23], it is possible to open only one lid section at a time to reduce the loss of heat while attending to the food or fire at one end of the double width cooker."  This is also evident in Figure 19 of Oliver.

114.    Oliver discloses that "lid ends 18 may be slid along rods 28 and 30 to vary the distance from lid 14 to vary flow of draft air for the first."  Additionally, claim 18 of Oliver recites "wherein at least one of the lid ends may be spaced apart from the lid reflector to provide combustion air for the cooker."  In order words, Oliver teaches that lid ends 18 create "openings…that would allow smoke, vapor and gas to escape from the cooking unit."  Oliver teaches that both the lid ends 18 and body ends 16 could be spaced apart from the lid reflectors to allow air to exit and enter.  To the extent the lid ends 18 are spaced apart from the lid reflector, the opening is created at the top of the grill.  The gaps or openings created by sliding the lid ends 18 are obviously a type of "exhaust" to anyone skilled in the art of barbecue combustion.

115.    Exhaust openings shaped like a chimney or smoke stack have been used for hundreds of years on fireplaces, stoves, boilers cookers, locomotives, smokers and grills, and are almost always placed above the location of intended heat transfer (e.g., the cooking surface).  The barrel-shaped boilers and smoke stacks on locomotives looking strikingly similar to barbecues and smokers that later evolved in the early 1900's at churches and roadside barbecues, and continued to be constructed and used today. Additionally, Holland '319 discloses a gas grill with an openable lid and at least one exhaust on the openable lid, closely resembling that described in the '712 patent.  As shown in Figure 2, Holland '319 discloses a hood or lid of the gas grill with two chimneys 46.

116.    U.S. Patent No. 6,606,986 to Holland (Holland '986) teaches that "it is common therefore for grills to use some type of a smoke exhaust vent in order to vent the smoke created in a grill."  Thus, if one did not want to rely on separating the lid ends from the lid reflector for venting in Oliver, a person skilled in the art would understand that the smoke stacks or chimneys taught by Holland '310 and Holland '986 could be used for venting.  Where the entire upper half is an openable cover (which itself is an advantage to provide full access to the grill/cooking surface), the logical and common location for exhausts would be in the cover.  It would have been obvious to a person skilled in the art to substitute the chimneys disclosed in Holland '319 for the openable lid ends 18 in Oliver.  This modification would not change or detrimentally affect the function of the Oliver grill.  As in the '712 patent, the exhaust openings would be located above the combustion and cooking surfaces.

117.    Oliver states that "FIG. 20 is a perspective view of the cooking system of

FIG. 19 wherein top reflectors are open and a container of fuel is positioned along one end thereof for cooking on a griddle on one side of the cooking system, and a charcoal grill is used on the other side." As shown in Figure 20, the second cooking unit (on the right) is configured to cook food using solid cooking fuel (i.e., charcoal) and is attached to the support structure (leg stands 24 and 26).

118.    Figure 20 also shows a grill or grate on the charcoal side of the unit on the right.

119.    Oliver also discloses that "lid ends 18 may be slid along rods 28 and 30 to vary the distance from lid 14 to vary flow of draft air for the first." It also would have been obvious in view of Holland '319 to modify the embodiment of Figure 20 of Oliver to include a smoke stack.

120.    Oliver specifically states that the units can be used simultaneously, and in Figure 20 shows gas and charcoal "configured to operate together." Specifically, Oliver states that "the system includes a number of additional features which enable it to be used in a number of different cooking modes as, for example, a grill, a baker, a boiler, a smoker, a steamer, a deep fat fryer, and the like. Some of these modes may be carried out simultaneously."

121.    Figure 23 of Oliver shows that the two covers (reflectors 14) are separately operable such that they selectively cover each grill independently. In describing the Figure 23 embodiment, Oliver states "[i]n this configuration, it is possible to open only one lid section at a time to reduce the loss of heat while attending to the food or fire at one end of the double width cooker." While this feature is not shown in the Figure 19 embodiment which utilizes gas and charcoal simultaneously, a person

skilled in the readily would readily understand the two independent covers in the embodiment of Figure 23 could be used in the embodiment of Figure 20 as they are both shown on the same frame. From a common sense standpoint, the depicted one-lid or two-lid configurations are effectively taught for all base grill combinations.

122.   While Oliver does not disclose a side burner, it was well known in the art to add side burners to barbecue grills. For example, U.S. Patent Nos. 4,886,045 to Ducate, 5,203,317 to James, 5,490,494 to Giebel, and 5,765,543 to Hopkins, each disclose a side burner unit attached to or attachable to a barbecue grill.

123.   Ducate describes a side cooker apparatus that attaches to and is supported by an existing grill structure and uses a gas burner. Figure 2 of Ducate shows a barbecue grill with side burner attached. Figure 4 shows the side burner 80, which utilizes a gas burner. Ducate discloses that its side burner is used with an independent pressure reducer, fuel line, and control valve and could therefore be used simultaneously with the primary burners. For example, Ducate explains: "Fuel is transferred between fuel tank 58 and auxiliary gas burner 94 through main valve 64, a second pressure reducer 68, a second gas line 62 and a control valve 95 mounted behind front wall 86." In commenting on the prior art grills, Ducate states that "while these prior art grills do provide means for simultaneously carrying out both a grilling operation and a pot or pan cooking operation, an improved arrangement for attaching an auxiliary burner to a gas fired grill is desirable." In other words, Ducate indicates that its side burner can be used simultaneously with the barbecue grill, and that such a configuration was known even before Ducate's filing date.

124.   James discloses "[a]n auxiliary burner for mounting on a shelf of a barbecue grill cart or the like is disclosed. The burner unit includes a housing with a

burner element and a fuel source. Brackets are provided for securing the burner unit to an existing shelf in spaced relation thereto."  With reference to Figure 1 of James, the side burner is shown as reference numeral 36.

125.    Giebel also discloses a side burner unit (reference numeral 30 in Figure 1).

126.    Hopkins discloses a side burner 10 attached to a barbecue grill 16, as shown in Figure 1 of Hopkins.

127.    These prior patents (Ducate, James, Giebel, and Hopkins) all demonstrate the use of a side burner on a gas barbeque grill.  The addition of a side burner would have been obvious because the side burner has been clearly shown as a useful attachment to a portable barbeque, and whether that barbeque has one grill or two does not affect the functionality of the side burner.  It also does not produce a new result, simply an aggregate of the separate units added together.  Thus, it would be obvious to one skilled in the art that one of the above independently operable side burners could be added to a multiple cooking unit structure such as that disclosed by Oliver for simultaneous operation.  It is an example of a predictable use of a prior art element according to its established function.

128.    While Oliver does not disclose an offset or side firebox, it was well known in the art to add side fireboxes to barbecue grills.  A number of prior art references teaches the addition of an offset or side firebox to a barbecue grill.  For example, U.S. Patent No. 4,664,026 to Milloy, the Cox patent, and Nemec each disclose a side firebox attached to a barbecue grill.  Figure 2 of Milloy shows a side firebox 12.  Figure 1 of Cox discloses a side firebox 14 attached to the grill.  Figure 1 of Nemec shows a side firebox 72 attached to a barrel-shaped grill.  The side firebox is attachable to and detachable from

a portable grill that itself has detachable legs and an exhaust 48.  It is clear that the addition of a side or offset firebox is not incompatible with an easily transportable grill. In fact, the Nemec invention claims to have the advantage that it "may be user assembled" and that the complete system can be easily packaged.

129.  The addition of a side firebox has been clearly shown as a useful attachment to a portable barbeque, and whether that barbeque has one grill or two does not affect the functionality of the side firebox.  It is an addition already shown in the prior art for barbeque grills, and would not produce a new effect.  These fireboxes would be configured to provide heat or smoke to the second cooking unit when a fuel material is burned or combusted in the firebox.  It would have been readily apparent to one of ordinary skill in the art that a firebox, such as disclosed in Milloy or Cox, has the ability to operate simultaneously with the barbecue grill units and any other cooking unit and/or burner associated with the Oliver.  It is the predictable use of a prior art element according to its established function.

130.  Oliver discloses that "the system includes a number of additional features which enable it to be used in a number of different cooking modes, as, for example, a grill, a baker, a boiler, a smoker, a steamer, a deep fat fryer, and the like.  Some of these modes may be carried out simultaneously."  Oliver also discloses that in the Figure 23 embodiment, "each lid assembly may be lifted independently to tend to the food or fire at that end of the cooker."  Thus, persons of ordinary skill in the art reading Oliver would clearly understand that the embodiments utilizing two cooking units (e.g., Figures 19, 20, and 23) were intended to be used and can be used simultaneously and are independently operable of each other.

131.   Oliver also discloses body ends 16 and lid ends 18, 19, which are substantially vertical panels positioned between the first and second cooking units.

132.   The addition of wheels to a support structure or cart for a barbecue grill was well known in the art.  For example, this feature is taught in many of the prior art patents we have already discussed, including, Nemec (Fig. 1), Milloy (Fig. 1), Cox (Fig. 1), Holland '319 (Figs. 1-4), Ducate (Fig. 2), James (Fig. 1), Koziol.  It is also disclosed in U.S. Patent No. 4,090,490 to Riley ("Riley") (Fig. 1).  Each of these prior art references teaches at least two wheels on a cart or support structure for a barbecue grill. It would have been obvious to one of ordinary skill in the art to add wheels to Oliver in order to make it more portable and easier to move around.

133.   Oliver discloses that "brackets 76 are used to support a propane burner 94 and propane tank 96."  The brackets 76 are clearly shown in Figure 20 of Oliver.

134.   A person skilled in the art reading Oliver inherently understands that a grill is a cooking device that uses a grate to hold food over a flame.  In the embodiment of Figure 20, a grill grate is shown in the cooking unit on the right side of the grill, and it would be understood that it is configured to hold food over a flame.  While a griddle is shown in the unit on the left in Figure 20, it would have been obvious to a person skilled in the art to substitute a grill or grate for the griddle, such that it would be configured to hold food over a flame.  Further, Oliver shows a grate over a gas flame in Figure 25.

135.   Oliver describes lid ends 18 that may be slid along rods 28 and 30 to vary the distance from lid 14 to vary the flow of draft air.  Sliding the lid ends 18 along the rods 28 and 30 creates "openings…that allow smoke, vapor and gas to escape from the cooking unit."  Since each lid end creates one opening, each lid would have two openings.

Holland '319 teaches a gas grill with two chimneys or smoke stacks 46 on the lid or hood 42 of the grill.  It would have been obvious to substitute the Holland '319 chimneys or smoke stacks for the slidable lid ends of Oliver.

136.   The cooking units in Oliver are substantially cylindrical in shape, as shown in Figures 19-21 and 23 of Oliver.  Oliver discloses a barbeque grill wherein the first and second cooking units are supported by a support structure such that the substantially cylindrical shape of the first cooking unit and the substantially cylindrical shape of the second cooking unit are aligned coaxially.  Figures 19-21 and 23 of Oliver clearly show this geometry.  Oliver discloses a barbeque grill wherein the first cover forms a portion of the substantially cylindrical shape of the first cooking unit, and wherein the second cover forms a portion of the substantially cylindrical shape of the second cooking unit.  Figures 19-21 and 23 of Oliver clearly show this geometry.

### b.      Invalidity Based on Koziol

137.   Koziol discloses every element of claim 1 of the '712 patent, except for explicitly showing exhausts on the openable first and second covers.  It specifically discloses the use of multiple cooking units with openable lids on a single support structure, including cooking units that use both gas and charcoal (solid) fuels.

138.   The preamble of claim 1 recites "a barbecue grill having multiple cooking units."  Koziol discloses a barbecue grill having multiple cooking units.  Koziol is directed to "an assembly for mounting a barbecue grill and a cooking related device such as an additional grill, burner or table top, to a support structure such as a post or cart."  Koziol discloses a grill mounting assembly 10 including a support member 12 that is either attached to a post 14 (that is secured to a deck or the ground) or mounted on a

movable cart apparatus 101.  This is discussed at 2:56-60 (post 14) and 4:46-48 (movable cart apparatus 101).  Examples of the support structures are shown in Figures 3 and 11 of Koziol.

139.    The embodiments of Figures 3 and 11 include gas barbecue grill units 20 and 21, either of which is a "first cooking unit configured to use gas cooking fuel." Koziol describes grill units 20 and 21 attached to the support member 12.

140.    A person skilled in the art would have understood that each cooking unit disclosed in Koziol necessarily includes a grill.  This is consistent with grill or grate shown in the charcoal grill embodiment of Figure 5.

141.    The grills shown in Figures 3, 4, 5, 6, and 11 of Koziol all have openable covers which selectively cover and uncover each grill unit.  Koziol does not specifically teach that the covers or lids are openable.  However, one of ordinary skill in the art would recognize the handles on the covers in Figures 3-6 and 11 to indicate the covers would be hinged on the back side and rotate open in the standard manner as depicted in burner unit 85 on the right side in Figure 6, where "a cover is also provided at 93 which is hinged by the hinges 94."

142.    One of ordinary skill in the art would understand based on his or her own knowledge that Koziol inherently includes an exhaust, as it is centuries-old technology and necessary for all covered grills, burners and cooking units to function.  All grills, including the grills disclosed in Koziol, must have vents.  While the grill assembly disclosed in Koziol does not have the smoke stack vents, it would have been obvious to one of ordinary skill in the art to add an exhaust as disclosed by Holland '319. Additionally, Holland '986 discloses that "it is common therefore for grills to use some

type of a smoke exhaust vent in order to vent the smoke created in a grill." The addition of smoke stack-style exhausts as disclosed by Holland '319 merely moves the exhaust vent to a cylinder at the top of the lid, above the cooking surface. For grills where the entire upper half is an openable cover, as in Koziol, the logical and common location for exhausts is in the cover.

143.   In the Summary of the Invention, Koziol teaches that "[i]n an alternate embodiment, the support member supports barbeque grills, at least one of which is charcoal fired." One of ordinary skill in the art would understand that since this is referring to gas grills, plural, the other grill inherently must be gas fueled. Koziol also states "while a gas grill unit has been utilized in conjunction with an auxiliary unit [a side burner], it is apparent that a charcoal grill unit such as indicated at 81, could likewise by employed. Barbecue grill units which utilize both gas and charcoal are also becoming popular." While Koziol does not include any figures showing a combination gas and charcoal grill, a person of ordinary skill in the art would clearly understand that Koziol teaches combining gas and charcoal cooking units on a common support structure.

144.   Koziol describes grill units 20 and 21 attached to the support member 12. A person skilled in the art would have understood that each cooking unit disclosed in Koziol necessarily includes a grill. This is consistent with grill shown in the charcoal grill embodiment of Figure 5.

145.   The grills shown in Figures 3, 4, 5, 6, and 11 all have openable covers which selectively cover and uncover each grill unit. Koziol does not specifically teach that the covers or lids are openable. However, one of ordinary skill in the art would recognize the handles on the covers in Figures 3-6 and 11 to indicate the covers would be

hinged on the back side and rotate open in the standard manner as depicted in burner unit 85 on the right side in Figure 6.  Koziol also discloses cut outs 30, 31, 33 and 35 to "provide combustion air."  While the grill assembly disclosed in Koziol does not have the smoke stack vents, it would have been obvious to one of ordinary skill in the art to add an exhaust in the openable covers of Koziol, as disclosed by Holland '319.

146.    It would have been apparent to one of ordinary skill in the art from the disclosure of Koziol, including its drawing figures, that the first and second cooking units are simultaneously operable.

147.    The grills shown in Figures 3, 4, 5, 6, and 11 of Koziol all have openable covers which are clearly independent from one another and would be understood to selectively cover and uncover the separate cooking units.

148.    The prior art references James, Giebel, Ducate and Hopkins each show and describe side burners for barbecues.  It would have been obvious to add a side burner to the embodiments of Koziol that have two grill units with covers on a single support structure.  In fact, Koziol discloses in Figure 6 an auxiliary burner unit 85 that resembles a side burner and is disposed to the side of grill 20 and supported by support member 12. The addition of a side burner would have been obvious to one skilled in the art because a side burner has been clearly shown as a useful attachment to a barbeque, and whether that barbeque has one grill or two does not affect the functionality of the side burner.  It also does not produce a new result, as it is simply an aggregate of the separate units added together.  It is an example of a predictable use of a prior art element according to its established functions.

149.    Prior art references Milloy, Cox, and Nemec each disclose the addition of

45

a side firebox to a barbecue grill.  The addition of a side firebox has been shown as a useful attachment to a barbeque, and whether that barbeque has one grill or two does not affect the functionality of the side firebox.  It is an addition already shown in the prior art for barbeque grills, and would not produce a new effect; instead it would just produce a simple aggregate effect of the separate components.  It has also been shown that the firebox has the ability operate simultaneously with the grill and any other cooking unit and/or side burner.  Thus, it would have been obvious to add a side firebox to Koziol that is supported by the support structure – it is the predictable use of a prior art element according to its established functions.

150.    Koziol teaches the combination of gas and charcoal cooking units on a single support structure.  The cooking units shown in the embodiments of Koziol (e.g., Figures 3, 4, & 11) are clearly independent from one another with separate and independent controls.  It would have been apparent to one skilled in the art that the two cooking units are independently operable of each other.

151.    The facing sidewalls of both the covers and the bases of the grill units 20 and 21 of Koziol are substantially vertical panels positioned between the first and second cooking units.

152.    Koziol discloses that cart 101 (Figures 11-15) has four wheels 103.

153.    Koziol discloses that "floor 104 forms a portion of the base portion 102 and supports the usual propane tank 105 which is centrally located and surrounded on three sides by the wall panels 106."  Koziol also discloses that "these doors 117 and 118 cover the side portions 120 and 121 and are slidable over the central portion 123 with tank 105."  This is shown in Figures 11-15 of Koziol.

154.   Each grill unit 20 and 21 of Koziol necessarily includes a grill or cooking grate, consistent with the grill shown in the charcoal unit 81 of Figure 5.  A person skilled in the art understands that a both gas and charcoal grills inherently cook food by holding the food over a flame.

155.   Holland '319 discloses two smoke stack type exhausts for use on the cover of a grill of any type, including gas fueled, as shown in Figure 1 and explained in column 1, lines 20-27 and 43-55, and column 3, lines 16-21.   Based on the teachings of Holland '319, it would have been obvious to a one skilled in the art to add two exhausts to the openable covers of Koziol.  Persons skilled in the art would understand the benefits of adding two exhausts to each of the covers of Koziol, including providing more uniform heating than adding only a single exhaust.  Additionally, it would have been obvious to put the exhausts on the openable cover.  For grills where the entire upper half is openable, the logical and common location for the exhausts is in the cover.

156.   With respect to the additional requirement that the cooking units have a "substantially cylindrical shape," the use of substantially cylindrical shapes for barbecue grills was well known in the art.  The barrel-shaped boilers and smoke stacks on the locomotives of the day look strikingly similar to barbecues and smokers that later evolved in the early 1900's at churches and roadside stands and continue to be construed and used today.  Oliver discloses two cooking units on a single support structure that are each substantially cylindrical shape.  Additionally, Riley and Nemec to name a few, all disclose barbecue grills having a substantially cylindrical shape.  Barrel-shaped grills are not new or novel, and it was commonplace to use old oil barrels, cut them in half, and build a barbecue.  The use of such a shape was common and well known to those of

ordinary skill in the art, and also has the advantages of simplicity, strength, and low cost. Thus, it would have been obvious to a person skilled in the art to modify the grill units in Koziol to have a substantially cylindrical shape, if such a look was desired.

157.   Koziol discloses first and second cooking units supported by the same support member 12 such that they are aligned substantially coaxially.  While the cooking units are not substantially cylindrical in shape, it would have been obvious in view of the prior art to modify the cooking units of Koziol to have a substantially cylindrical shape.

158.   It also would have been obvious to modify Koziol to have grilling units that are substantially cylindrical in shape.  In such a configuration, the covers of the grill would form a portion of the substantially cylindrical shape, similar to the embodiments in Oliver, Riley, and Nemec.

### c.     *Invalidity Based on McLane*

159.   Claim 1 of the '712 patent is obvious over McLane in view of Holland '319 and/or Oliver.  McLane discloses every element of claim 1 of the '712 patent, except openable first and second covers and exhausts on the openable first and second covers.  McLane discloses a barbecue grill having a foldable stand 12 that supports a plurality of grill housings that can be used with conventional charcoal or with the gas burner.  The grill housings are shown in Figure 1 to be independent of one another and, thus, can be used simultaneously.  *See, e.g.*, 1:52-54 ("The present invention comprises a barbecue grill having a foldable stand that supports a plurality of grill housings.") and 5:5-6 ("The grill of the present invention can be used with conventional charcoal if desired or with the gas burner described above").  Figure 1 shows multiple units or grill housings 16 adapted to be used with charcoal, and grill housing 14 that is

adapted to be used with gas.  McLane discloses that "a gas burner element includes an elongated metal tubular heating element that extends within at least one of the housings." *See, e.g.,* 1:62-64 and 3:24-26.  It would have been obvious to one skilled in the art to modify the grill in McLane to have individual covers or lids for each of the grill housings, as well as an exhaust on each of the list, as disclosed by Oliver and Holland '319.  Doing so would not hinder the McLane invention as the lids could be made transportable. Although McLane is directed to an upwardly open (no lid) design, the use of such a lid or cover would not prevent the operation of the McLane grill.  Lids and covers with openings for exhausts have been used by cooks for hundreds of years.  And it was well known in the art that grills with lids or covers must have an exhaust for venting, and it would have been obvious to add covers with exhausts to McLane.

160.    Pursuant to the Federal Declaratory Judgment Act, Academy requests a declaration by the Court that the Patents-in-Suit are invalid.

## COUNT III
## DECLARATORY JUDGMENT OF UNENFORCEABILITY

161.    Academy realleges and incorporates by reference paragraphs 1-161 as if fully set forth herein.

162.    An actual controversy exists as to the unenforceability of the '646 and '773 patents based on the discussion above.

### A.    The '646 Patent Is Unenforceable For Inequitable Conduct Because A&J Withheld Its Prior Sales Of The Duo Grill.

163.    A patent is rendered unenforceable for inequitable conduct if an applicant breaches his or her duty of good faith and candor by either misrepresenting or failing to disclose material information to the U.S. Patent Office.  The duty of candor and good faith in dealing with the Patent Office under 37 C.F.R. § 1.56(a) requires that each

individual associated with the filing of a patent application disclose to the Patent Office all information known to that individual that is material to patentability.  Individuals who bear this duty include each inventor and each attorney or agent who prosecutes the application.  The duty of candor and disclosure exists with respect to each pending claim until the claim is cancelled or withdrawn from consideration, or the application becomes abandoned.

164.    To prove inequitable conduct, an alleged infringer must demonstrate that, when applying for a patent, an individual misrepresented or omitted material information with specific intent to deceive the PTO.  Information is material if the patent would not have been issued but for the misstatement or omission.

1.    The Prosecution History of the '646 Patent

165.    The '019 application, which issued as the '646 patent, was filed on May 16, 2011 by Jon M. Isaacson on behalf of Mr. Simms.  The '019 application was filed as a continuation of the '320 application, which was filed on July 30, 2005 and later issued as the '712 patent.

166.    The Examiner issued a first office action on September 1, 2011 rejecting the single claim of the '019 application for failure to meet the written description requirement of 35 U.S.C. § 112 because Figures 3-7 of the '019 application were not disclosed in the '320 application.  The Examiner stated that the '019 application was not entitled to a priority date equal to the filing date of the '320 application.  The Examiner issued a second office action and repeated the grounds of rejection.

167.    On December 20, 2011, Mr. Isaacson filed a response to the second office action amending the application from a continuation to a continuation-in-part, and stating that the Examiner did not need to make a determination of priority except in certain

circumstances, such as to avoid intervening prior art.  That same date, Mr. Isaacson also filed an information disclosure statement that attached the article "Be a Grill Master" published in the July/August 2010 issue of *Vertical*.  Mr. Isaacson indicated that the Applicant and/or Mr. Isaacson had known of the article for greater than three months before it was submitted to the U.S. Patent Office.

168.    The Examiner issued a notice of allowance on January 26, 2012 stating that the application was not entitled to the filing date of the earlier application and that entitlement to priority of the continuation-in-part application would not be considered unless it was actually needed, such as to avoid intervening prior art.  Mr. Isaacson filed a "Comment on Statement of Reasons for Allowance" stating:

> The examiner did not need to, ***and is instructed not to***, consider the entitlement to priority of the present application because the examiner did not identify any references which (1) question the patentability of the present application, and (2) are dated between the filing of the parent application and the filing date of the present application.

169.    On April 25, 2012, the application was transferred to another law firm, and the '646 patent issued on May 29, 2012.  Neither Mr. Isaacson nor the new law firm disclosed any prior sales information to U.S. Patent Office that would have required the Examiner to consider whether the '019 application was entitled to the benefit of the earlier filing date of the '712 patent.

170.    The Applicant and Mr. Isaacson were aware that such prior sales information existed.  Specifically, A&J sold the Duo Grill in 2007 and Academy received Duo Grills in the United States and sold them in retail locations in the United States from 2007 through 2010.

2.      The Prior Sales Of The Duo Grill Were Material.

171.    The prior sales were material because the '646 patent would not have been issued but for the withheld information because (1) the '019 application was not entitled to the filing date of the '320 application; and (2) the prior sales anticipated the '646 patent claim under 35 U.S.C. § 102(b).

172.    All of Figures 1-7 of the '646 design patent are necessary for a complete disclosure of the claimed design.  Figures 3-6 of the '646 patent disclose side, top, and rear views that are not disclosed in the perspective views disclosed in the '712 patent. The perspective views disclosed in Figures 1-3 of the '712 patent do not adequately disclose the convex design of the back of the lid, or any details concerning the back of the lid.  The back of each lid could have any number of different designs, especially where the lid is connected to the grill body, including openings and voids in the solid surface. Thus, because the '646 patent discloses design features that are not disclosed in the '712 patent, the '646 patent is not entitled to the filing date of the '712 patent.

173.    The Examiner also stated in the Notice of Allowance that she did not consider the entitlement to priority because no intervening prior art had been identified despite the '646 patent being identified as a continuation-in-part.

a.      *The Prior Sales Anticipated the '646 Patent.*

174.    Academy received Duo Grills in the United States and sold them in retail locations in the United States from 2007 through 2010, and the design of the semi-cylindrical lids did not change from 2007 through 2010.  A&J Duo Grill sales earlier than May 16, 2010, one year before the filing date of the '646 patent, are prior art under 35 U.S.C. § 102(b).

175.    Under the applicable ordinary observer test, the prior sales anticipated

the '646 patent.  That is, an ordinary observer comparing the Duo Grill and the '646 patent would see that both grill designs have two separate grill lids situated at the same height and with a space between the two lids.  An ordinary observer would also notice the same semi-cylindrical shape of the grill lids.  The nearly or actually identical nature of these features would lead an ordinary observer to find that the prior sale design and the '646 patent are substantially the same.  Thus, the prior sales of the Duo Grill anticipate the '646 patent.

> b.  The Applicant And The Prosecuting Attorney Were Aware Of The Prior Sales.

176.  A&J, assignee of the '646 patent, made sales of the Duo Grill in the United States for at least four years before the filing of the '019 application.  That was enough time for Academy to make over 10,000 sales of the Duo Grill.  These prior sales were not nominal or experimental – they were substantial and likely generated substantial revenue for A&J, thus increasing the interest in design patent protection.  Because Mr. Simms had knowledge of the prior sales of the Duo Grill his company sold, he violated his duty of good faith and candor to the U.S. Patent Office when he did not disclose the prior U.S. sales of the Duo Grill.

177.  Further, Messrs. Simms and Isaacson must have discussed the intervening prior sales because Mr. Isaacson submitted a document evidencing such prior sales on December 20, 2011.  This submission was made shortly after the Examiner stated that the '646 patent did not have priority back to the '320 application, indicating to Mr. Isaacson that intervening prior sales were material to the prosecution of the '646 patent.  Mr. Isaacson also instructed the Examiner to not consider the question of priority to the '646 patent.  The most reasonable inference from these facts is that Mr. Isaacson and

Mr. Simms discussed the intervening prior sales of Duo Grills. Thus, the most reasonable inference from the evidence is that Mr. Isaacson also had knowledge of the prior sales of the Duo Grill.

178.    Even in the unlikely event that Mr. Simms withheld the prior sales from Mr. Isaacson in breach of Mr. Simms' own duty of candor and good faith under 37 C.F.R. § 1.56, knowledge of the invalidating information should be imputed to the Mr. Isaacson. Any other result would allow Mr. Simms and Mr. Isaacson to contravene the law prohibiting inequitable conduct using the very deceptive conduct that the law prohibits. Thus, the single most reasonable inference to be drawn from the evidence is that Mr. Isaacson had knowledge of the prior sales of the Duo Grill. The first prong of the inequitable conduct analysis therefore is satisfied because a specific individual, here both Mr. Simms and Mr. Isaacson, failed to disclose material information.

### 3.    The Failure To Disclose The Prior Sales Was Intentional.

179.    Mr. Isaacson's specific intent to deceive is the single most reasonable inference to be drawn from his (1) actual or imputed knowledge of the U.S. sales of the Duo Grills by A&J for at least four years before the filing of the '646 patent; (2) demonstrated knowledge that those intervening prior sales were material; and (3) specific instructions to the Examiner to not consider the priority status of the '019 application.

180.    The single most reasonable inference to be drawn from the evidence is that both Messrs. Simms and Isaacson knew of the prior sales. As also noted above, Mr. Isaacson knew that intervening prior sales were material to the patentability of the '646 patent. Indeed, Mr. Isaacson first noted that the Examiner need not determine entitlement to priority, and later instructed the Examiner not to consider entitlement to priority, in the absence of intervening prior art. The reason that the Examiner had not identified any

intervening prior art reference was because Mr. Isaacson had not disclosed the relevant prior art sales information to the Examiner.  Mr. Isaacson's understanding of the materiality of the intervening prior art, evidenced in part by his instruction to the Examiner, supports a finding that Mr. Isaacson had a specific intent to deceive the U.S. Patent Office when he failed to disclose the prior sales to the Examiner.  Accordingly, Mr. Isaacson's actions or omissions constitute inequitable conduct with respect to the '646 patent.

**B.**   **The '773 Patent Is Unenforceable For Inequitable Conduct Because A&J Withheld Its Prior Sales Of The Duo Grill.**

181.   The discussion above concerning the unenforceability of the '646 design patent for inequitable conduct is equally applicable to the '773 patent, and the '773 patent is unenforceable due to inequitable conduct.  Mr. Simms, the inventor of the '773 patent and principal of A&J, and Mr. Isaacson, the attorney prosecuting the '773 patent, were aware of prior sales of the Duo Grill more than one year before the filing date of the '773 patent application.  Such prior sales were material and that the single most reasonable inference is that Mr. Isaacson's failure to disclose the prior sales was intentional.

1.   The Prosecution History of the '773 Patent

182.   The '027 application, which issued as the '773 patent, was filed on May 16, 2011 by Mr. Isaacson on behalf of Mr. Simms.  The '027 application was filed as a continuation of the '320 application.

183.   The Examiner issued a first office action on August 26, 2011 rejecting the single claim of the '027 application for failure to meet the written description requirement of 35 U.S.C. § 112 because Figures 3-7 of the '027 application were not disclosed in the '320 application.  As was the case for the '646 patent, the Examiner

stated that the application was not entitled to the priority date equal to the filing date of the '320 application.  The Examiner issued a second office action and repeated the grounds of rejection.

184.    On January 3, 2012, Mr. Isaacson filed a response to the second office action amending the application from a continuation to a continuation-in-part, and stating that the Examiner did not need to make a determination of priority except in certain circumstances, such as to avoid intervening prior art.  That same date, Mr. Isaacson also filed an information disclosure statement that attached the article "Be a Grill Master" published in the July/August 2010 issue of *Vertical*.  Mr. Isaacson indicated that the Applicant and/or Mr. Isaacson had known of the article for greater than three months before it was submitted to the U.S. Patent Office.

185.    The Examiner issued a notice of allowance on March 5, 2012 stating that the application was not entitled to the filing date of the earlier application and that entitlement to priority of the continuation-in-part application would not be considered unless it was actually needed, such as to avoid intervening prior art.  On May 30, 2012, the application was transferred to another law firm, and the '773 patent issued on July 3, 2012.  Neither Mr. Isaacson nor the new law firm disclosed any prior sale information to U.S. Patent Office that would have required the Examiner to consider whether the '019 application was entitled to the benefit of the earlier filing date of the '712 patent.

186.    The Applicant and Mr. Isaacson were aware that such prior sales information existed, namely, that Academy received Duo Grills in the United States and sold them in retail locations in the United States from 2007 through 2010 and that the design of the Duo Grill did not change from 2007 through 2010.

2.    The Prior Sales Of The Duo Grill Were Material.

187.    The prior sales were material because the '773 patent would not have been issued but for the withheld information, for the same reasons with respect to the '646 patent: (1) the '027 application was not entitled to the filing date of the '320 application; and (2) the prior sales anticipated the '773 patent claim under 35 U.S.C. § 102(b).

*a.    The '773 Patent Was Not Entitled To The Earlier Filing Date Because It Disclosed New Matter.*

188.    Figures 1-7 of the '773 patent are necessary for a complete disclosure of the claimed design.  Figures 3-6 of the '773 patent disclose side, top, and rear views that are not disclosed in the perspective views disclosed in the '712 patent.  The perspective views disclosed in Figures 1-3 of the '712 patent do not adequately disclose numerous design elements associated with the back of the three smoke stacks.  For example, the '712 patent figures do not disclose where the smoke stacks connect to the grill lids, as shown in Figure 3 of the '773 patent.  Thus, because the '773 patent discloses design features that are not disclosed in the '712 patent, the '773 patent is not entitled to the filing date of the '712 patent.  Further, as was true of the '646 patent, that the '773 patent is a continuation-in-part of the '712 patent is of no moment.  And the Examiner specifically stated in the Notice of Allowance that she did not consider the entitlement to priority because no intervening prior art was identified.

*b.    The Prior Sales Anticipated the '773 Patent.*

189.    As was the case with respect to the '646 patent, an ordinary observer comparing the Duo Grill and the '773 patent would see that both grill designs have three smoke stacks, with both grills having two smoke stacks near the center of the center of the left grill lid.  An ordinary observer would also note that the two smoke stacks have

cut outs at the top, whereas the smoke stack on the right has no such cut out.  The nearly or actually identical nature of these features would lead an ordinary observer to find that the prior sale design and the '773 patent are substantially the same.  Thus, the prior sales of the Duo Grill anticipate the '773 patent.

        *c.*      *The Applicant And The Prosecuting Attorney Were Aware Of The Prior Sales.*

190.    With respect to the '773 patent, the single most reasonable inference to be drawn from the evidence is that Mr. Isaacson had knowledge of the prior sales of the Duo Grill.  The first prong of the inequitable conduct analysis therefore is satisfied because a specific individual, here both Mr. Simms and Mr. Isaacson, failed to disclose material information.

        3.      <u>The Failure To Disclose The Prior Sales Was Intentional.</u>

191.    Mr. Isaacson's specific intent to deceive is the single most reasonable inference to be drawn from his (1) actual or imputed knowledge of the U.S. sales of the Duo Grills by A&J for at least four years before the filing of the '773 patent; and (2) demonstrated knowledge that those intervening prior sales were material.

192.    With respect to the '773 patent, the single most reasonable inference to be drawn from the evidence is that both Mr. Isaacson and Mr. Simms knew of the prior sales.  As also noted above, Mr. Isaacson knew that intervening prior sales were material to the patentability of the '773 patent.  Indeed, Mr. Isaacson noted that the Examiner need not determine entitlement to priority in the absence of intervening prior art.  The reason that the Examiner had not identified any intervening prior art reference was because Mr. Isaacson had not disclosed the relevant prior art sales information to the Examiner.  Mr. Isaacson's understanding of the materiality of the intervening prior art supports a finding

that Mr. Isaacson had a specific intent to deceive the U.S. Patent Office when he failed to disclose the prior sales to the Examiner.   Accordingly, Mr. Isaacson's actions or omissions constitute inequitable conduct with respect to the '773 patent.

193.   Thus, both the '646 and '773 patents are unenforceable based on inequitable conduct.

194.   Accordingly, pursuant to the Federal Declaratory Judgment Act, Academy requests a declaration that the '646 and '773 patents are unenforceable.

## EXCEPTIONAL CASE

Given the above facts, A&J has no good faith basis to assert that the Academy Redesign Grills infringe the Patents-in-Suit, the Patents-in-Suit are valid, or that the '646 and '773 patents are enforceable in view of inequitable conduct.   Accordingly, the Court should find this to be an exceptional case under 35 U.S.C. § 285 in favor of Academy.

## PRAYER

Academy respectfully requests a judgment against A&J as follows.

A.   In favor of Academy and against A&J on all of Academy's claims;

B.   A declaration that Academy does not infringe the Patents-in-Suit;

C.   A declaration that the Patents-in-Suit are invalid;

D.   A declaration that the '646 and '773 patents are unenforceable;

E.   A determination that this case is exceptional under 35 U.S.C. § 285 in favor of Academy;

F.   An award to Academy of its costs and attorneys' fees incurred in this action; and

G.   Further relief as the Court may deem just and proper.

## JURY DEMAND

Academy hereby demands a trial by jury on all issues so triable.

Dated: July 17, 2014                        Respectfully submitted,

                                            */s/ Darin M. Klemchuk*
                                            Darin M. Klemchuk
                                            Attorney-in-Charge
                                            State Bar No. 24002418
                                            Southern District of Texas Bar ID #23662

                                            Kirby B. Drake
                                            State Bar No. 24036502
                                            **KLEMCHUK KUBASTA LLP**
                                            Campbell Centre II
                                            8150 North Central Expressway, 10th Floor
                                            Dallas, TX 75206
                                            Telephone:      (214) 367-6000
                                            Facsimile:      (214) 367-6001
                                            Email: darin.klemchuk@kk-llp.com
                                                        kirby.drake@kk-llp.com

                                            *Counsel for Plaintiff Academy, Ltd.*